Filed 7/28/25  R.S. v. Superior Court CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| R.S.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,<br><br>        Respondent;<br><br>SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>        Real Party in Interest. | E086096<br><br>(Super.Ct.No. J302614)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Lynn M. Poncin, Judge.  Petition denied.

Julian Turner for Petitioner.

No appearance for Respondent.

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Real Party in Interest.

1

R.S. (mother) petitions for extraordinary relief pursuant to rule 8.452 of the California Rules of Court seeking an order of this court directing the San Bernardino County juvenile court to vacate its order setting a Welfare and Institutions Code section 366.26 permanent plan selection hearing and to instead issue orders directing return of A.D. (the child) to mother and terminating the juvenile dependency proceedings.[1] We will deny the petition.

**BACKGROUND**

In October 2024, presumed father J.D. (father) and mother (collectively, the parents) lived together with the child. A maternal half-sibling, J.P., born in January 2016, divided his time between living with mother, staying with J.P.'s father, and staying with the maternal grandmother in another city while attending school. Mother is a registered nurse and, at the time the juvenile dependency proceedings were initiated, she was in a master's program for nursing; father was unemployed and attending college.

1. *The Circumstances Leading to the Child's Detention*

The family came to the attention of real party in interest, San Bernardino County Department of Children and Family Services (the Department), after the parents took the child, then four months old, to the hospital because his left leg was swollen. Examination of the child at the hospital revealed he had suffered several injuries: fracture of the distal end of his left femur, fracture of the proximal end of his left tibia,

---

[1] All statutory references herein are to the Welfare and Institutions Code unless otherwise noted. All references to the rules are to California Rules of Court.

bilateral tibia fractures, nondisplaced fracture of proximal end of fibula, and a nondisplaced fracture of the distal end of his right tibia.

The parents reported that the child had been solely in their care for the prior two weeks and he had not fallen or suffered any trauma. Mother said she had no concerns when she and father took the child to his well-baby visit 10 days earlier, on October 14, 2024. At that time, the child's legs had full range of motion and he did not express any pain.

The parents offered two possible explanations for the injuries. One was that the family shares the same bed and father may have rolled over on the child. The other was that the fractures occurred at the October 14, 2024, well-baby visit when a nurse vaccinated the child by giving two injections in his left leg and one injection in his right leg.

With respect to the second theory, the parents reported that, on October 15, 2024, the day after receiving the immunizations, the child was fussy and his left leg was red and hot, with localized swelling and "some green" at the site of the injection. Mother scheduled a telehealth appointment with a physician assistant for October 19, who advised mother to give the child Tylenol. The next day, the parents took the child to an urgent care clinic, where the child was given allergy medication and antibiotics to treat possible cellulitis.

When the child continued to be very fussy, mother had a video visit with the child's primary care physician, Dr. Julianne O. Lee, on October 22, 2024, who increased the dose of antibiotics. When Dr. Lee called mother the next day, the parents reported the

child's leg continued to be swollen, and the doctor advised them to take the child to the emergency room. The day after speaking with Dr. Lee, the parents brought the child to Children's Hospital of Orange County where the child was admitted and the fractures in his legs were discovered.

Dr. Nicole Dudaney, a resident fellow at the hospital, told the Department's investigating social worker that the child's injuries were not consistent with receiving immunizations or by someone rolling over the child while sleeping. Dr. Dudaney stated further labs and scans would be undertaken, and that the child's care would be overseen by Dr. Hilary Lin as well as the child protective team physician at the hospital, Dr. Daphne Wong. Dr. Wong confirmed that the parents' explanations were not consistent with the type of injuries sustained by the child. She also mentioned that the parents told her the child had been in their sole care for the prior two weeks.

On October 25, 2024, the Department obtained a detention warrant, took the child and his maternal half-sibling J.P. into custody and filed a section 300 juvenile dependency petition.[2] The petition alleged that the child suffered serious nonaccidental harm (§ 300, subd. (a)), the parents failed to protect the child from that harm (§ 300,

---

[2] It is apparent from the reporters' transcripts that juvenile dependency proceedings were initiated as to J.P. and that his case was heard at the same time as the child's. The juvenile court asserted jurisdiction over J.P. and, at the disposition hearing, his case was dismissed and family law orders were entered granting his father full legal and physical custody, and allowing mother supervised weekly visits. Mother has appealed those orders (this court's case *In re A.E., et al.; CFS v. R.S.*, E086049). Mother's appointed counsel recently filed a no-issues brief and the time for mother to file a supplemental brief runs on August 7, 2025.

4

subd. (b)(1)), and the child is under the age of five and suffered severe physical abuse by a parent or someone known to the parent, and the parents reasonably should have known of the abuse (§ 300, subd. (e)).[3]

The juvenile court ordered the child detained and ordered the Department to provide services to the parents pending development of a case plan. The child was placed in foster care where he remained until March 2025, when he was placed with his maternal grandmother.

A combined hearing on jurisdiction and disposition was set for November 2024.

2. *Developments Pending the Hearing on Jurisdiction and Disposition*

The November 2024 combined contested hearing on jurisdiction and disposition was continued several times to allow time for completion of medical examinations, as well as to provide time for the Department to obtain medical records and for the parties to review them. While the hearing was pending, the Department filed a report on jurisdiction and disposition, followed by six updating "CFS 6.7" reports containing additional information for the court, including the child's medical records provided to the Department.

---

[3] "Severe physical abuse" as used in subdivision (e) is defined in relevant part as an act of abuse that causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death. (§ 300, subd. (e).)

(a) *The Reports Concerning the Child's Injuries*

The Department's investigating social worker, Riana Melgoza, interviewed physicians and others involved in examining and caring for the child. Dr. Lee, reported the child "'was okay and stable'" and did not cry excessively when she examined him on October 14, 2024. The LVN (licensed vocational nurse) who administered the vaccines said she has never had a child cry excessively during an appointment, that she does not hold children down while administering shots but instead has parents hold the child and she only holds the leg into which she is administering the shot.

Dr. Lin, the physician who treated the child while he was hospitalized in October 2024, reported that the child did not have the genes associated with osteogenesis imperfecta (brittle bone disease), but that the disease could not be ruled out entirely. The child did not have a vitamin deficiency that would cause his bones to break easily. The doctor noted the fractures were sustained due to "'quite a lot of force.'"

In November 2024, Dr, Lin ordered an x-ray bone survey (skeletal survey) to see if there were additional fractures and to determine the healing stage of the fractures. The survey not only confirmed the broken bones in the child's legs but also revealed a healing fracture of his left distal ulna (his wrist).

Dr. Wong told social worker Melgoza that the broken wrist could have been caused by squeezing, and the fractures of the legs were caused by a direct blow, yanking, or by pulling or twisting, and that there was no determinative way to establish whether the fractures occurred in a single episode or in multiple events occurring around the same time. Dr. Wong opined the fractures would heal without permanent damage,

6

disfigurement, or death, but thought the child would sustain additional injuries if the child remained in the same environment. The child's injuries were "very concerning for physical abuse."

(b) *The Parent's Progress in Predisposition Services*

Pending the hearing on disposition, the Department provided father with therapy, parenting education, and anger management classes. Father began therapy on December 10, 2024. In February 2025, the therapist reported he and the father "initially examined the general situation, including the issues that led to [the Department's] involvement." The therapeutic services father was receiving related to his need to be a protective parent and to address domestic violence and its impact on children.

In April 2025, the Department provided a referral for father to receive additional counseling services. At that time, social worker Melgoza was informed father was not attending his anger management course. Father said he had forgotten to log in.

Mother's predisposition services included individual counseling, parenting classes, and provision of a parent partner. In her January 23, 2025 report, the mother's therapist noted mother had made progress in identifying different types of abuse, and reported mother had told the therapist she did not injure the child in any way and that she had never seen father display anger in an unhealthy way that could harm the child. Mother also "explored the [jurisdiction disposition] report" and the child's injuries with the therapist. During that exploration, mother "identified that she doesn't know how [the child] received the injuries, except for when he received his shots."

On March 11, 2025, mother told the parent partner assigned to her by the Department that she did not need that service and that she was focusing on her schooling.

Mother's counsel arranged a psychological evaluation of mother, which took place on March 26, 2025. Mother told the psychologist that her children were removed after the child was found to have multiple fractures in his legs, and that the child was fine leading up to a doctor's appointment where the child received immunizations. The report concluded (i) mother did not have personal or relationship factors which would interfere with her ability to benefit from family reunification services, and (ii) services would give mother the opportunity to increase her insight and awareness of factors that led to the child's removal, which would prevent the re-abuse or neglect of the child.

3. *The Hearing and Orders on Jurisdiction and Disposition*

The jurisdiction/disposition hearing went forward on April 30, 2025. The Department's jurisdiction/disposition report and its updating reports were entered into evidence.

(a) *Mother and the Social Workers Testify, and Father Declines to Answer Questions*

Father was called to testify by mother. On advice of counsel, he invoked his Fifth Amendment privilege not to answer questions.

Mother testified on her own behalf. She explained her failure to acknowledge the child had been abused, saying "like I couldn't believe it. It's like going from still being postpartum, going to the new grad program, going to school, as well, for your master's and new grad classes came, along with where I work at, I just—I couldn't fathom it. It

8

just was a shock. I was in shock." Mother responded in the affirmative to her counsel's question whether, "considering therapy [she] took, considering what is stated in the social worker's reports," did she believe the child's injuries resulted from abuse.

Mother did not know when she started to recognize the child had been abused but thought "[i]t would have been most likely during the skeletal reports because it was more hardened facts and it had a better view of what was going on." Mother said she reviewed the report possibly a month before the hearing, then said she did not know, but probably when the doctor reports started coming out. She could not remember if she told social worker Melgoza that the child had been physically abused, but she did recall telling her therapist that sometime toward the end of her first round of therapy.

Mother said she made efforts to remediate the juvenile court's and the Department's concern about abuse by telling father to leave the home, taking the parenting classes required by the Department where she learned about child abuse and neglect, and by asking for additional therapy sessions.[4]

Mother called the social worker, Sicily Williams, who had been assigned to handle the immediate response referral from the child abuse hotline concerning the child and who also prepared the detention report. On direct examination, Ms. Williams confirmed the statements in her report that the child's half-sibling, J.P., did not show signs of abuse or neglect, and that the half-sibling's father and the maternal grandmother denied safety

---

[4] On November 20 2024, the day the jurisdictional/dispositional hearing was set to begin, mother's counsel represented that, as of the day before, mother and father were no longer living together.

9

concerns regarding the child in mother's care. On cross-examination, Ms. Williams recalled the child had suffered fractures to his left and right legs, that the parents thought the injuries were caused by the immunizations the child received, or might possibly had been caused by the family's co-sleeping arrangement. She also recalled that two physicians at the hospital reported that the child's injuries were not consistent with being rolled over on during co-sleeping or with receiving immunizations.

Mother also called social worker Melgoza, who had prepared the reports on jurisdiction/disposition and the subsequent information filings. Ms. Melgoza did not believe mother's testimony that mother had changed her earlier views about the cause of the child's broken bones. Ms. Melgoza elucidated, "[i]t was very clear from the beginning that the doctors explained that the child's injuries were not consistent with [mother's] stories from the detention report. Even when [Ms. Melgoza] interviewed [mother] after the detention, [mother] maintained the same story and continuously did so throughout the case. [Mother] has only said the child was abused today at trial." And, contrary to mother's testimony that she had told her therapist that the child had been physically abused, Ms. Melgoza recalled mother's statement reported by her therapist that neither mother nor the father hurt the child, and that the injuries occurred when the child was vaccinated.

(b) *The Juvenile Court's Findings and Orders*

The juvenile court found true the petition's allegations that the child comes within subdivisions (a) and (b)(1) of section 300. The sustained allegations (which were the same for both subdivisions (a) and (b)(1) and pled the same supporting facts as to each

parent) stated that the child sustained nonaccidental bone fractures while he was in the care and custody of the parents, and such abuse places the child at risk in the parents' care. At the Department's request the court dismissed without prejudice the allegations that the child came within section 300, subdivision (e).

The court adjudged the child a dependent of the court and removed him from his parents' custody. Family reunification services were bypassed under subdivision (b)(6) of section 361.5 and the matter was set for a section 366.26 permanent plan selection hearing.[5]

Mother filed a petition for an extraordinary writ seeking an order from this court directing the juvenile court to vacate the removal order and to place the child back in her custody.

## DISCUSSION

The sole argument mother raises in her petition is that the removal order is not supported by sufficient substantial evidence.

The juvenile court removed the child from his parents' physical custody upon a finding, required to be supported by substantial evidence, that there is, or would be, a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child if he were returned home, and there are no reasonable means to protect

---

[5] Subdivision (b)(6) of section 361.5 provides in relevant part that services need not be provided to a parent if there is clear and convincing evidence that a child has been adjudicated a dependent of the court pursuant to any subdivision of section 300 as a result of infliction of severe physical harm the child and the court finds that it would not benefit the child to pursue reunification services with the offending parent.

the child's physical health without removing him from his parents' physical custody. (§ 361, subd. (c)(1).)

When presented with a challenge to the sufficiency of the evidence to support a finding that requires clear and convincing standard of proof, we must determine whether the record viewed as whole contains sufficient substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005 (*O.B.*); *In re M.D.* ( 2023) 93 Cal.App.5th 836, 857 (*M.D.*) We draw all reasonable inferences in support of the finding, view the record favorable to the juvenile court's order, and affirm the order even if there is other evidence that supports a contrary finding. (*M.D.*, *supra*, at p. 857.) We do not evaluate the credibility of witnesses or determine the weight of the evidence. (*Ibid.*) Mother bears the burden to show there is insufficient evidence to support the court's decision. (*Ibid.*)

Contrary to mother's claim, substantial evidence supports the court's removal order. Dr. Lee said the child was "'okay and stable'" and did not cry excessively during his well-baby visit on October 14, 2024, and mother reported that the child's legs had full range of motion and that he did not express any pain during Dr. Lee's examination. Nine days later, the parents brought the child to the hospital where it was discovered he had broken bones in both legs and a broken wrist.

Mother acknowledged that she and father had been the child's sole caretakers during the two-week period before the child was taken to the hospital, but denied having any knowledge how the injuries occurred, and each believed the other parent did not

12

physically abuse the child. Mother continued to express the belief that the fractures were sustained during the child's October 14, 2024, doctor appointment and father thought that he may have or may not have rolled onto the child while father was asleep even after the physicians overseeing the child's care expressed their opinions that the parents' explanations were not consistent with the type of injuries the child had suffered.

In the the six months elapsing between the discovery of the child's injuries in October 2024 and the April 2025 hearing on jurisdiction and disposition, mother continued to consistently deny the child had been physically abused. The therapist providing predisposition counseling reported in January 2025 that mother said she did not injure the child, she had never seen father express anger in any unhealthy way that could harm the child, and that she did not know how the child could have been injured "except for when [the child] received the shots." On March 26, 2025, mother told the psychologist evaluating her at the request of her counsel that the child was removed when he was found to have multiple fractures in his legs and that he was "doing fine" leading up to the doctor's appointment where he received immunizations. Social worker Melgoza testified that mother maintained the injuries-caused-by-immunization story continuously throughout the case.

When mother testified, she blamed being postpartum and her busy schedule for her inability to accept the fact the child's injuries were the result of physical abuse but stated that, by the time of the hearing, she had come to believe the child had been abused. Mother could not identify when or why she changed her mind except it could have been when she saw the "more hardened facts" in the skeletal report, which might have

13

reviewed a month before the hearing. Although the court did not specifically find that mother's testimony was not credible, it noted she had not expressed her acceptance of the fact the child had been abused until that day and that she did not give consistent answers to questions concerning when and how she changed her mind.

In short, at the time of disposition, the court had before it a 10-month-old child who, when four months old, suffered a broken wrist likely caused by squeezing and multiple leg fractures caused by direct blows, yanking, or pulling and twisting, fractures that required the use of quite a lot of force and which had been inflicted nonaccidentally either in a single episode or in multiple ones occurring around the same time, and which happened while the child was in the sole care and custody of his parents who did not admit that one or the other, or both, had broken the child's bones. In view of those facts, we conclude the juvenile court's decision to remove the child was amply supported by substantial evidence.

Mother posits that there is not sufficient substantial evidence to support the child's removal because she never admitted to physically abusing him, she had no history of child abuse as evidenced by the statements of maternal grandmother and uncle that they never saw injuries to the child, and the Department's theory that mother is culpable is based on speculation because it did not establish a nexus between her conduct and the child's injuries. Mother is mistaken.

The nexus between mother's conduct and the child's injuries is found in the sustained allegations of the dependency petition, not challenged by mother in her writ petition, which establish that the child sustained several nonaccidental bone fractures

while in mother's care and custody. Mother's testimony that she did not abuse the child and the fact she has no prior history of abusing her children do not overcome the ample evidence set forth *ante* that supports the juvenile court's finding by clear and convincing evidence that there were no reasonable means to protect the child's physical health without removing the child from his parents' physical custody.

## DISPOSITION

The petition for extraordinary writ and the request for stay are denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

MILLER
J.
CODRINGTON
J.

15